IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

MICHAEL DEAN KYKENDALL                                                    PLAINTIFF

v.                                    Civil No. 1:23-cv-01089-BAB

SHERIFF RICKY ROBERTS, Union
County, Arkansas; CAPTAIN LISA WORLEY,
Union County Detention Center (UCDC);
DR. DEANNA HOPSON, Physician, UCDC;
LIEUTENANT NOAH SORRELLS, UCDC                                   DEFENDANTS


**MEMORANDUM OPINION**

    Plaintiff, Michael D. Kykendall ("Kykendall"), filed this case pursuant to 42 U.S.C. § 1983.   He contends his constitutional rights were violated while he was detained in the Union County Detention Center ("UCDC").   Specifically, he contends Defendants Roberts, Worley, and Sorrells failed to provide a safe way for him to climb up and down from the top bunk and denied him adequate medical care.   Additionally, he contends Defendant Hopson failed to provide him with necessary medical care.

    This case is before the undersigned pursuant to the consent of the parties.   (ECF No. 32). Defendant Hopson has filed a Motion for Summary Judgment.   (ECF Nos. 41-43).   Defendants Roberts, Worley, and Sorrells (collectively "the County Defendants") have also filed a Motion for Summary Judgment.   (ECF Nos. 45-47).   Kykendall has filed a combined Response to the motions.   (ECF No. 49).   Defendant Hopson filed a Reply.   (ECF No. 50).   The County Defendants also filed a Reply.   (ECF No. 51).   The Motions are ready for decision.

1

# I.    BACKGROUND

Kykendall was booked into the UCDC on April 5, 2023.   (ECF No. 47-1 at 4).[1]   He was booked in on pending criminal charges as well as a felony violation of his parole.   *Id.* at 4-6. Kykendall was released on December 19, 2023.   (ECF No. 41-4 at 11).

On May 20, 2023, and on May 21, 2023, Kykendall fell when attempting to get down from the top bunk.   (ECF No. 1 at 4).   Kykendall indicates there is no ladder or step on the center bunk beds in E-6 while the other sets have a ladder or step.   *Id.*   Kykendall is 5'6" and 56 years old. *Id.*   When he fell on May 21st, Kykendall hit the side of his head and landed awkwardly on his back on the concrete floor.   *Id.* at 5.

Defendant Sorrells was present on May 21, 2023, and questioned Kykendall about the fall. (ECF No. 41-4 at 2).   Because his head was bleeding, Kykendall was bandaged up and placed on a concussion protocol.   *Id.*   Kykendall's neck and back were bothering him but during the next couple of days his pain worsened.   *Id.* at 2-3.   His left arm was hurting the following day.   *Id.* at 3.   While over time his back condition has improved, he still suffers from neck pain and has headaches "a lot" he assumes "because of [his] neck."   *Id.* at 3 & 13.   His arm no longer hurts but is "messed up."   *Id.* at 3.

After the May 21, 2023, fall, the nurses gave him over-the-counter pain relievers.   (ECF No. 41-4 at 4).   When he saw Defendant Hopson the first time, she prescribed steroids to take for a week as well as over-the-counter pain relievers.   *Id.*   Initially, the steroids helped "knock the

---

[1] All record citations are to the CM/ECF number and page rather than the designation given to the documents by the parties.

pain out." *Id.*   However, by the time Kykendall was done taking them, the pain was "just as bad as it was." *Id.* at 5.

Kykendall became frustrated because he was receiving the same medications for months ("260-something days") and it was doing "no good."  (ECF No. 41-4 at 5 & 13).   While he was still experiencing the same amount of pain, Kykendall testified Defendant Hopson "just continued to minimize that and stated it would go away." *Id.* at 13.   Kykendall began requesting an MRI. *Id.* at 5.   At first, Defendant Hopson told him it was just a pulled "muscle or ligament or something of that nature" which would "clear up in a couple of weeks." *Id.*   According to Kykendall, Defendant Hopson and the nurses believed Kykendall's problems would just go away.  *Id.* at 7.

After about sixty days, Kykendall testified that Defendant Hopson started "telling me her hands were tied on what she could do."  (ECF No. 41-4 at 5).   Defendant Hopson told him on about three occasions that she was limited because of funding.[2]  *Id.* at 6.   It was Kykendall's understanding that "as long as I was in jail they was not going to do any testing on me that they didn't have to do."  *Id.*   Basically, Kykendall testified Defendant Hopson indicated "[s]he could not do for me, while I was in there, like if I was a regular patient."  *Id.* at 12.   Kykendall believed he should have been treated the same whether he was incarcerated or not.  *Id.*   If Defendant Hopson could not do more to resolve his issues, Kykendall felt he should have been referred to an outside physician to have the proper tests run to see what was wrong with his neck.  *Id.* at 7.

---

[2] Kykendall's testimony regarding whether Defendant Hopson said she was limited because of funding is contradictory.  He initially testified as stated in the body of the opinion.  Then he testified "[s]he never said because of money."  (ECF No. 41-4 at 6).  Immediately thereafter, he testified he is "pretty sure she said something about because of funding one time" but he would not swear to it.  *Id.* In his response to interrogatories, Kykendall indicated Defendant Hopson said her hands were tied; she was limited to the medical help she could provide because he was in jail; and she was limited on the medical help she could provide.  (ECF No. 41-3 at 7).

When he finally received an MRI, Kykendall testified Defendant Hopson said the pain he was suffering from was the result of degenerative disc disease and arthritis. (ECF No. 41-4 at 9). Kykendall believed Defendant Hopson was concerned about his condition and it seemed like she wanted to help him. *Id.* at 10 & 12-13. After his release, Kykendall was not able to go to a doctor immediately because of difficulties with signing up for insurance. *Id.* at 11. Kykendall's deposition was taken on April 8, 2024, and he testified he had an appointment with Dr. Hartley which was cancelled because he did not have his insurance card. *Id.* Kykendall indicated he would go back sometime that week or the following week. *Id.*

After Kykendall was in the UCDC for a period, he learned that other people had fallen getting down from the bunks. (ECF No. 41-4 at 5-6). And "they went ahead and took care of whatever the problem was—took them to the emergency room." *Id.* at 6.

By affidavit, Defendant Hopson indicates she has provided medical care at the UCDC since 2016 and has done so as an employee of Turn Key Health Clinics, LLC., since 2021. (ECF No. 41-1 at 1). On May 25, 2023, Dr. Hopson was notified that "Kydendall placed a medical call for complaints of neck and back pain, burning sensation on his hand, and dizziness after falling from his bunk the prior Sunday." *Id.* Defendant Hopson recommended Kykendall stay hydrated, stretch, and not stay idle to help his muscles." *Id.*

The medical records indicate that after his fall Kykendall's head wound was treated and he was prescribed Acetaminophen 325 mg 2 tablets for no more than seven days "without Provider order." (ECF No. 41-2 at 11). On May 23, 2023, Kykendall submitted a medical request asking to see the nurse or doctor because his back and neck had been hurting since his fall on Sunday night. *Id.* at 13. He also complained of sharp pains and numbness in his leg." *Id.* In response,

Kykendall was seen by the nurse the following day. *Id.* at 13-15. The nurse noted muscle tightness and edema and that Kykendall's range of motion was limited due to pain. *Id.* at 14-15. However, there were no signs of acute distress. *Id.* at 15. The nurse also noted Kydendall's blood pressure was high but he denied previously having suffered from hypertension. *Id.* at 15. By phone, Defendant Hopson ordered Ibuprofen 800 mg twice a day as needed for pain for seven days. *Id.* at 13 & 16.

On May 25, 2023, Kykendall submitted a medical request complaining of increased pain in his back and neck; sharp pain, a burning sensation, and numbness in his hands and right leg; and being constipated. (ECF No. 41-2 at 17). Kykendall was seen by the nurse that day and placed on the list to see Defendant Hopson. *Id.* at 17-18. He was told to drink plenty of water, move around more— "don't just lay around"—and do slow movements to stretch his neck and back muscles. *Id.*

Kykendall was seen by Defendant Hopson on May 29, 2023. (ECF No. 41-2 at 19). She found no edema in his extremities but noted: "finger joints boney enlargement" with "mild ulnar deviation." *Id.* at 20. She indicated Kykendall had a good range of motion in his C-spine and L-spine with the C-spine being tender only in the paraspinous muscles and the lumbar area "tender left paraspinous." *Id.* Her assessment is listed as: "musculoskeletal back pain with muscle tenderness and occasion spasm acute radiculopathy, tingle in right hand." *Id.* at 21. Defendant Hopson ordered x-rays of the cervical and lumbar spine. *Id.* She also ordered an intramuscular injection of steroids, with a Medrol dose pack to start the following day, and Ibuprofen 500 mg, twice daily, as needed for pain. *Id.* The Ibuprofen was to be held while he was on steroids. *Id.*

On May 30, 2023, the cervical and lumbar spine x-rays were taken. (ECF No. 41-2 at 25-

28).   The lumbar spine results showed a possible transitional segment ("possibly 6 non rib-bearing lumbar-type vertebral bodies") and mild spondylitic changes throughout.   *Id.* at 25.   There were no acute findings.   *Id.*   The cervical spine results showed "[m]ild degenerative disc disease with no acute findings."   *Id.* at 27.   Mild disc space narrowing existed at C2-C3, C5-C6, and C6-C7 "with mild osteophyte formation."   *Id.*   That same day, Kykendall was given the intramuscular injection of steroids.   *Id.* at 29.

Kykendall submitted his next medical request on June 7, 2023.   (ECF No. 41-2 at 30). He complained of moderate to severe pain rated at a 7 to 9 on a ten-point pain scale.   *Id.* Kykendall said he had been following Defendant Hopson's orders but it had not helped.   *Id.* Kykendall further reported experiencing sharp pains in his right hand and it feeling like it was on fire "regularly."   *Id.*   He asked for some relief*."*   *Id.*   On June 8th, the nurse noted he would be seen by Defendant Hopson the following Monday.   *Id.*

Kykendall was seen by Defendant Hopson on June 12, 2023.   (ECF No. 42-1 at 31-34). Defendant Hopson noted Kykendall was complaining of persistent pain in his back and neck and sharp pains in his right hand.   *Id*. at 31.   Defendant Hopson indicated Kykendall's neck was supple; there was no edema in his extremities; and he had a good range of motion in his cervical spine and lumbar spine.   *Id.* at 31-32.   She noted Kykendall was tender in the "muscles on either side, muscle flanks."   *Id.* at 32.   Defendant Hopson ordered Ibuprofen 800 mg twice daily as needed for pain and Oxcarbazepine[3] 150 mg, twice daily.   *Id.* at 33.

On July 3, 2023, Kykendall submitted a medical request stating he was still experiencing

---

[3] Defendant Hopson indicated this medication was an anti-seizure medication that could be used to ease chronic pain.   (ECF No. 41-1 at 2).

moderate to severe pain in his neck and back and his right hand was regularly burning.   (ECF No. 41-2 at 35).   He requested an MRI to determine what was wrong.   *Id.*   On July 5th, the nurse noted that Kykendall was scheduled to see the provider on Monday due to his request for an MRI. *Id.*

On July 10, 2023, Kykendall saw Defendant Hopson who reviewed the x-rays and advised him they showed he had chronic arthritis.   (ECF No. 41-2 at 36).   Defendant Hopson again noted the joints in his hands all had boney enlargement and there was no difference in strength in his upper extremities.   *Id.* at 37).   Defendant Hopson discontinued the Ibuprofen, added Naproxen 500 mg, twice daily, and increased the dosage of Oxcarbazepine to 300 mg, twice daily.   *Id.* at 38.   She also offered to give Kykendall another steroid shot but he refused.   *Id.*   Finally, Dr. Hopson noted she had discussed Kydendall's activities with the nurse who had not noticed a "difference in his movements or walking speed from when he first arrived."   *Id.* at 39.

Kykendall submitted his next medical request on July 30, 2023.   (ECF No. 41-2 at 42). Kykendall wrote: "My neck and back have been hurting worse over the past week."   *Id.*   He described the pain as being more on the sides of upper and lower back.   *Id.*   He indicated his neck was hurting on the sides and right "below my neck."   *Id.*   Finally, he said he was still experiencing burning and sharp pain in his right hand.   *Id.*   He again asked to have an MRI.   *Id.* That same day, a nurse wrote that he was scheduled to see Defendant Hopson the following Monday.   *Id.*

Kykendall was seen by Defendant Hopson on July 31, 2023.   (ECF No. 41-2 at 43).   She wrote: "Right leg is better, spots in right hand come and go.   Neck bothers him.   States right hand has funny sensations off and on, neck just hurts.   Low back hurts comes and goes, some pains

around hips but not down his leg." *Id.* Defendant Hopson noted that Kykendall was able to move his neck easily during conversation; his grip was good; and his arm strength was good and equal bilaterally. *Id.* at 43- 44. She indicated Kykendall had no motor deficits. *Id.* at 44. Defendant Hopson's assessment was that Kykendall suffered from arthritis in multiple joints including the spine and mild loss of disc height due to chronic changes on the C-spine. *Id.* at 45. Further, Dr. Hopson noted Kykendall's blood pressure was persistently high and urged him to reconsider his refusal to take blood pressure medication. *Id.* 45-46. She stopped the Naproxen for four days, ordered a Medrol dose pack for six days, Ibuprofen 800 mg twice daily as needed and Tylenol 500 mg twice daily as needed. *Id.* at 45. She ordered blood pressure checks twice daily for two weeks. *Id.*

Kykendall next submitted a medical request on September 25, 2023. (ECF No. 41-2 at 48). Kykendall said his neck was hurting "very bad" at the bottom of his neck and going into his shoulders. *Id.* Kykendall was seen by the nurse and scheduled to see Dr. Hopson the following Monday. *Id.* at 48-50. The nurse instructed Kykendall to avoid heavy lifting and strenuous activity until the problem resolved and ordered cold compresses for twenty-four hours, Acetaminophen, Ibuprofen, and rest for three days. *Id.* at 50.

On October 2, 2023, Kykendall was seen by Defendant Hopson. (ECF No. 41-2 at 52). Kykendall complained of numbness on the back of his right arm, hand, and neck. *Id.* If Kykendall turned his head to the left, it hurts his lower neck. *Id.* Kykendall reported doing stretches, half push-ups, and jogging in place. *Id.* Defendant Hopson noted Kykendall's finger joints were "knobby," and tenderness in trapezius at shoulder/neck junction. *Id.* at 53. She again urged Kykendall to take blood pressure medication to protect his heart. *Id.* at 54. Dr. Hopson

continued Kykendall on Oxcarbazepine 300 mg twice daily, Acetaminophen 500 mg, two tablets twice daily on an as needed basis, and Ibuprofen 200 mg, four tablets, twice daily on an as needed basis. *Id.* at 55.

On October 22, 2023, Kykendall submitted the following medical request: "Can you please ask the doctor if she can order me an MRI because there is nothing different with my neck or back pain than it was the last time I saw her and I have complied with EVERYTHNG she has recommended but have got no relief for neck and back pain and numbness and burning." (ECF No. 41-2 at 51. The following day, a nurse wrote that she had spoken to Dr. Hopson who would speak to Dr. Cooper, the Turn Key Medical Director, about ordering an MRI. *Id.* On October 25th, a medical note was made that the MRI would be ordered. *Id.* at 56. An order for the MRI of c-spine without contrast was entered on October 30th. *Id.* at 58.

On October 30, 2023, at 4:30 pm a patient note was made that Kykendall had ceased exercising after being questioned by the nurse/MD during doctor call. (ECF No. 41-2 at 57). Previously the nurse had been told that Kykendall had been exercising "quite often" even though he was complaining of continuous pain. *Id.* Additionally, it was noted the nurse had been told that Kykendall had intentionally hit his head to "beef up his lawsuit against the jail." *Id.* Another inmate reported that Kykendall had faked a fall in the shower and rubbed his head on the shower corner. *Id.* Finally, the inmate reported that Kykendall continuously picked at the site to make it bleed and appear worse. *Id.*

A second patient note was entered by the same nurse that day at 6:24 pm. (ECF No. 41-2 at 59). The nurse indicated at morning medication pass she had noted Kykendall had a small scratch in the center of his forehead with dried blood. *Id.* When he requested a Band-Aid,

Kykendall was advised he would have to put in a sick call. *Id.* Kykendall indicated he had. *Id.* However, on completion of medication pass, the nurse noted Kykendall had not submitted a sick call request. *Id.*

Kykendall's MRI was scheduled for November 3, 2023. (ECF No. 41-2 at 61). However, no transport deputies were available that day and the MRI was rescheduled for November 15th. *Id.* at 63-64. The MRI showed "mild multilevel degenerative changes, worse at C5-6 and C6-7. There is moderate neural foraminal stenosis on the right at C6-7. Mild neural foraminal stenosis on the left at C4-5 and bilaterally at C5-6." *Id.* at 73.

On November 18, 2023, Kykendall submitted a medical request complaining that his right leg was swollen from his ankle up to his calf and his left shoulder and arm were also swollen. (ECF No. 41-2 at 74). He added that he has been hurting since he fell but the leg swelling had just started five or six days ago. *Id.* Kykendall was seen by the nurse the following day and scheduled to see Defendant Hopson on November 27th. *Id.* The nurse noted a slightly decreased range of motion and possible varicose veins in the right calf. *Id.* at 77.

Kykendall submitted his next medical request on November 24, 2023. (ECF No. 41-2 at 79). Kykendall complained his neck and lower back were "hurting badly" and he was having some periodic numbness in his right leg. *Id.* Note was made that Kykendall was scheduled to see Defendant Hopson on November 27th.

When Kykendall was seen by Defendant Hopson on November 27, 2023, he reported a fall the night before and hitting his head. (ECF No. 41-2 at 80). Kykendall indicated he had fallen previously but had not reported each fall. *Id.* Defendant Hopson indicated the nurse who had evaluated his calf pain indicated it was related to a pulled muscle. *Id.* She noted his left shoulder

pain was not new.  *Id.*  Defendant Hopson discussed with Kykendall that his blood pressure was consistently high and attempted to get him to agree to taking blood pressure medication.  *Id.*  Kykendall also reported pain in his left bicep.  *Id.*  Defendant Hopson noted Kykendall had an abrasion in the center of his forehead with no bruising.  *Id.* at 81.  She indicated his left bicep "is in a wad proximally with apparent loss of attachment distally.[4]"  *Id.*  She further noted the presence of a scar on the distal upper arm.  *Id.*  Defendant Hopson's assessment was:

> arthritis of cervical spine with chronic disc changes and mild to moderate foramen stenosis bilaterally at lower levels.
> HTN untreated.
> probable torn left bicep, not new
> skin abrasion forehead.

*Id.* at 82.  Dr. Hopson convinced Kykendall to take blood pressure medication and added Amlodipine 5 mg daily to his daily medication.  *Id.* at 83.  She also ordered a steroid injection.  *Id.* at 82.  Finally, Defendant Hopson indicated Kykendall needed to be in a nursing cell with a walker for fall safety.  *Id.* at 83.

On November 28, 2023, Kykendall refused to be placed in a nursing cell.  (ECF No. 41-2 at 84).  He was warned that his refusal increased his risk of worsening his medical condition and could even lead to death.  *Id.*

On December 1, 2023, Kykendall informed the nurse at medication pass that the blood pressure medication was making him feel and sleep better.  (ECF No. 41-2 at 85).  On December 3rd, Kykendall submitted a medical request to see Defendant Hopson about his neck.  *Id.* at 86.

---

[4] The Court is somewhat trouble by the lack of records regarding Kykendall's torn left bicep.  However, aside from mentioning the injury to his left arm in one of his earlier medical requests, Kykendall did not continue to seek treatment for this injury.   Additionally, during his deposition, Kykendall testified that while he believed his bicep was torn during the fall, he had "no issue with the biceps thing and the arm thing."   (ECF No. 47-1 at 39).

He reported his "neck is hurting very bad its like something is pressing down on it or pulling it down or pinching it [] is right at the bottom part of my neck." *Id.* Kykendall was seen by the nurse on December 6th. *Id.* at 87. She noted he was complaining of sharp constant pain and pressure. *Id.* Kykendall assessed his pain level as 8 on a 10-point scale. *Id.* He reportedly told the nurse he knew they could not do much but he was petitioning the court. *Id.* at 88. The nurse directed Kykendall to avoid heavy lifting and strenuous activity until the problem resolved. *Id.*

Defendant Hopson saw Kykendall on December 11, 2023. (ECF No. 41-2 at 89). She noted he was complaining of his neck hurting with most of the pain being at the base of the neck on both sides. *Id.* Kykendall is reported to have said the pain in his leg had resolved after the steroid shot. *Id.* Kykendall also complained of constipation. *Id.* Defendant Hopson noted Kykendall was moving his neck well but was tender in both trapezius muscles at the base of the neck. *Id.* at 89-90. Defendant Hopson's assessment was neck pain with some muscle spasms and constipation. *Id.* at 91. She ordered stool softener to be given to Kykendall daily. *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant acted under color of law and that he or she violated a right secured by the Constitution.[5]  *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999).

Under § 1983 a Defendant may be sued in both his or her individual capacity and official capacity. An individual or personal capacity claim is one which seeks to impose individual liability on government officials for actions taken under color of law. *Hafer v. Melo,* 502 U.S. 21, 25 (1991). Thus, the Plaintiff must show only that the official, acting under color of law, caused the deprivation of a federal right. *Id.* (citation omitted). An official capacity claim is

---

[5] Medical care contractors and their employees who provide medical care to inmates in jail or prison are considered state actors for purposes of section 1983. *See Davis v. Buchanan Cty.,* 11 F.4th 604, 617 (8th Cir. 2021).

13

considered a claim against the employing governmental entity. *Crawford v. Van Buren Cty.,* 678 F.3d 666, 669 (8th Cir. 2012). To establish liability the government entity's policy, custom, or failure to train or supervise must have played a part in the violation of federal law. *Hafer,* 502 U.S. at 25.

### A.   Motion for Summary Judgment by Defendant Hopson

Defendant Hopson maintains she is entitled to summary judgment on the following grounds. First, Defendant Hopson maintains Kykendall cannot establish either prong of the deliberate indifference standard. In this regard, she maintains Kykendall was provided with proper and adequate medical care. Second, Defendant Hopson contends there is no evidence of a custom, policy, or practice to support an official capacity claim.

### 1.   The Deliberate Indifference Standard

In prisoner litigation, courts in the Eighth Circuit analyze denial of medical care claims under the deliberate indifference standard of the Eighth Amendment. *See e.g., Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020) (pretrial detainee has the same rights to medical care under the Due Process Clause as an inmate has under the Eighth Amendment).[6] The Court therefore examines Kykendall's claims under the Eighth Amendment's deliberate indifference standard. *Id*.

---

[6] Kykendall indicates he is a pretrial detainee in his Complaint. (ECF No. 1 at 2). However, his booking sheet indicates that in addition to being incarcerated on several new charges, he had a probation violation charge pending. (ECF No. 47-1 at 6). While a pretrial detainee's claim is analyzed under the Fourteenth Amendment, the Eighth Circuit applies the same deliberate indifference standard to denial of medical care claims brought by pretrial detainees noting that they are entitled to at least as much protection as under the Eighth Amendment. *See e.g., Johnson v. Leonard,* 929 F.3d 569, 575 (8th Cir. 2019). Thus, for purposes of this claim, the Court need not determine if Kykendall should be treated as a pretrial detainee or a convicted prisoner.

To succeed on this type of claim, Kykendall must demonstrate (1) that he had an objectively serious medical need, and (2) that the Defendants actually knew of, but deliberately disregarded, that serious medical need. *See Ivey v. Audrain Cty., Mo.*, 968 F.3d 845, 848 (8th Cir. 2020). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (internal quotations omitted). "To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the [detainee's] health." *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) (internal quotations and citations omitted). The Eighth Circuit has stated that this "onerous standard requires a showing more than negligence, more than even gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013) (internal quotations and citations omitted).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. Cty. of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009).

"A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis[,]" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (internal quotations omitted),

15

unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub v. VonWald*, 638 F.3d 905, 919 (8th Cir. 2011) (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *see also Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (holding a three-week delay, "coupled with knowledge of inmate-patient's suffering, can support a finding of an Eighth Amendment violation").

### 2. Individual Capacity Claim

In this case, Kykendall was seen by Defendant Hopson on May 29th, June 12th, July 10th, July 31st, October 2nd, November 27th, and December 11th during the relevant time frame—April 5 to December 19, 2023. She provided prescription medications and over-the-counter medication to help Kykendall manage his pain; ordered X-rays and an MRI; provided steroid injections; gave Kykendall lifting and strenuous exercise restrictions; and offered Kykendall assignment to a medical cell to protect him from falls and to allow him to use a walker.

Although it took some time for an MRI to be ordered, one was ordered and its results examined and explained to Kykendall. The decision not to order an MRI sooner was an exercise in medical judgment which the Court will not second guess. *Estelle v. Gamble,* 429 U.S. 97, 107 (1976). Further, there is no evidence that failing to receive the MRI earlier was detrimental to Kykendall. *See Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir. 2005) (When an inmate alleges a delay in medical treatment, "the objective seriousness of the deprivation should also be measured by the effect of delay in treatment. To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay")

While the Court agrees that more avenues of treatment may have been available including the provision of appropriate exercises, physical therapy, pain management classes, a nerve conduction study, referral to a specialist, and prescription pain medication, not pursuing these avenues does necessarily equate to deliberate indifference. "Neither differences of opinion nor medical malpractice state an actionable Constitutional violation." *Jones v. Norris,* 310 F.3d 610, 612 (8th Cir. 2002) (citing *Estelle,* 429 U.S. at 105-06). Kykendall has advanced no medical evidence suggesting that the treatment he received was inadequate in any way. Further, the Eighth Circuit has held that the offering of "over-the-counter pain medications, rather than prescription medications, does not constitute deliberate indifference." *Johnson v. Leonard,* 929 F.3d 569, 576 (8th Cir. 2019) (dental care context).

Kykendall believes he should receive the same level of medical care as that available to non-incarcerated or free world individuals. The Constitution, however, does not require detention facilities to provide "perfect, the best obtainable, or even very good" medical care; rather, it requires the provision of adequate medical care. *Harris v. Thigpen,* 941 F.2d 1495, 1510 (11th Cir. 1991); s*ee also Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006) (not entitled to best medical care). "Because society does not expect that prisoners will have unqualified access to health care,' [a]s long as [the deliberate indifference threshold] is not crossed . . . doctors remain free to exercise their independent medical judgment.'" *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)).

While the Court is sympathetic to the plight of prisoners suffering from chronic pain, the Constitution guarantees only adequate medical care. Here, as mentioned above, Kykendall was seen and evaluated on a routine basis; he underwent diagnostic tests; he was provided daily pain-

relieving medication and steroid injections; and he was offered access to a nursing cell to reduce the possibility of continued falls.   In short, nothing demonstrates "intentional maltreatment or criminal recklessness" on Defendant Hopson's part.   *Johnson,* 929 F.3d at 576 (citing *Fourte v. Faulkner, Cty.,* 746 F.3d 384, 387 (8th Cir. 2014) (deliberate indifference may be found where medical care evidences intentional maltreatment) and *Holden v. Hirner,* 663 F.3d 336, 343 (8th Cir. 2011) (deliberate indifference is akin to criminal recklessness).   Defendant Hopson is entitled to summary judgment on the individual capacity claim.

### 3.    Official Capacity Claim

"[A] corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies."   *Sanders v. Sears, Roebuck & Co.,* 984 F.2d 972, 975-76 (8th Cir. 1983) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978)).   "The proper test is whether there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983."   *Id.*   In this case, Kykendall has presented no such evidence.   Further, as no unconstitutional act has been found on the part of a Turn Key employee, Turn Key cannot be held liable under an official capacity theory.   *Webb v. City of Maplewood,* 889 F.3d 483 (8th Cir. 2018).

### B.    Motion for Summary Judgment by Defendants Roberts, Sorrells, and Worley

Defendants Roberts, Sorrells, and Worley ("the County Defendants") argue they are entitled to summary judgment on several grounds.   First, they contend the bunks were safe and Kykendall was not subjected to unconstitutional conditions of confinement.   Second, they argue there was no deliberate indifference to Kykendall's serious medical needs on their part.   Third, they argue that Defendants Roberts and Sorrells were not personally involved in any of the alleged

18

unconstitutional conduct.   Fourth, they argue there is no basis for official capacity liability on Washington County's part.   Finally, the County Defendants argue they are entitled to qualified immunity.

### 1.  Additional Background Related to Unconstitutional Conditions of Confinement

Kykendall contends he was subjected to unconstitutional conditions of confinement because there was no ladder or step providing a means to access and exit the top bunk where he slept.   Kykendall fell at least twice—on one occasion suffering injuries.

According to Defendant Worley's affidavit, the bottom bunk is 16" off the floor and the upper bunk is 52" off the floor.   (ECF No. 47-1 at 2).   Defendant Worley states that contrary to Kykendall's assertion "each bunk has a crossbeam rail at both ends of the bunk that was roughly halfway between the bottom and top bunks—34" off the floor.   *Id.*   She maintains that most inmates step on the bottom bunk as a first step when accessing the top bunk.   *Id.*   Defendant Worley indicates that some detainees also use the cross beam.   *Id.*   In either event, Defendant Worley asserts that she has "never actually seen any detainee have a problem getting into a top bunk.   "Certainly, neither I nor any of the Defendants ever thought the bunks presented any excessive or substantial risk to any detainee's health or safety prior to Mr. Kydendall's alleged fall (in fact, I do not believe that to be true today)."   *Id.*   Further, Defendant Worley states that while roughly half the inmates sleep on the upper bunks, she has "never noticed a difference in the number of claimed falls and/or injuries between upper and lower bunks."   In her words, such falls are "notoriously suspect, as they are often 'cover' stories to account for injuries from fights or other behavior they want to hide from us."

Bunks are not assigned at the UCDC.   (ECF No. 47-1 at 2).   Instead, each detainee is

provided "with a foam mat, towel, ad blanket and they can choose where they want to sleep."   *Id.*

Defendant Worley has provided the following photograph of the bunks with the

crossbeams:



(ECF No. 47-1 at 11).

Kykendall testified that only two out of three of the beds in the Max Pod cells have the crossbeam or ladder.   (ECF No. 47-1 a 19).   According to Kykendall, the center beds apparently had a second bunk added at some point.   *Id.*   These bunks did not have the crossbeam or ladder. *Id.*   Kykendall testified there was no safe way to get up and down from the top bunk.   *Id.*   While he was at the UCDC, Kykendall testified three other inmates fell from the center bunks and suffered serious injuries.   *Id.*

Kykendall indicated he wrote Defendant Worley asking if they could fix the beds and was told maintenance was working on it.   (ECF No. 47-1 at 19); *see also id.* at 19 (May 30, 2023, grievance answered by Worley); at 23 (May 25, 2023, grievance appeal without response); at 26 (May 25, 2023, grievance appeal without response); at 29 (October 1, 2023, grievance without a response); 30 (May 22, 2023, grievance without response)   While Defendant Worley continued to advise him that maintenance was working to remedy the situation, Kykendall testified that they "never touched the beds out there."   *Id.* at 22.   Kykendall felt the problem could have been solved by providing a "handle, a ladder, steps, just do it like the other beds.   Anything of that nature." *Id.* at 88.

With respect to Defendant Worley's statement that his fall may have been faked, Kykendall testified the fall would have been on camera and there was nothing fake about it.   (ECF No. 47-1 at 21).   Kykendall also submitted the declaration of Kendall Washington who witnessed the fall. (ECF No. 49 at 9).   Washington stated Kykendall was bleeding from the head following the fall. *Id.*   Washington also pointed out that Kykendall's bunk did not have a ladder or step on it like others in the cell did.   *Id.*

Kykendall stated that in the fall he "busted my head, hurt my back, and tore a bicep in my

[left] arm."   (ECF No. 47-1 at 23-24).   He also indicated he hurt his neck in this fall.   *Id.* at 24. Kykendall indicated the torn bicep could only be repaired through surgery which they "couldn't do."   *Id.*

Prior to moving to the top bunk, Kykendall had been on the floor in E6.   (ECF No. 47-1 at 25).   However, two inmates had been removed from the pod for staph infection.   *Id.*   One inmate had been on the floor and the other was on a top bunk on the right which did have a ladder, however, because they were not given any cleaning supplies, Kykendall moved to the top bunk where there was no ladder to avoid contracting staph infection.   *Id.*

Kykendall submitted the sworn statement of Calvin D. Hart who indicated he suffered an injury to the right side of his abdomen on January 20, 2021, when getting up on the top bunk. (ECF No. 49 at 8).   The injury was diagnosed as a hernia that required surgical correction.   *Id.* In Joshua Wilson's sworn statement, he indicated he fell on January 14, 2023, when attempting to get up on the bunk and was taken to the emergency room where it was determined that his right "A.C. joint was completely torn out of socket" and he needed to be seen by an orthopedic surgeon. *Id.* at 10.   Wilson indicates he was released on signature bond and when he went to have surgery, he was told the UCDC had pulled their funding and it was up to him to pay for the surgery.   *Id.* at 11.   In Steven Price's sworn declaration, he states that the "center bunks in E-pod do not have a ladder or step on them or a safe way [to get] up and down."   *Id.* at 12.   Sen Quan Miller' declaration is virtually identical.   *Id.* at 13.

### 2.   Unconstitutional Conditions of Confinement

Unlike denial of medical care claims, the applicable constitutional analysis differs in conditions of confinement claims depending on whether the inmate is a pretrial detainee or a

convicted inmate.[7]    Pretrial detainees cannot be subjected to conditions of confinement that amount to punishment under the Due Process Clause of the Fourteenth Amendment.  *Bell v. Wolfish,* 441 U.S. 520, 535-37 (1979).   In contrast, the claims of convicted inmates are analyzed under the Eighth Amendment.   As previously noted, Kykendall had new criminal charges pending but also had a parole violation charge pending—he was a pretrial detainee/parolee.   In cases involving pretrial detainees/parolees "both Fourteenth Amendment due process concerns and the Eighth Amendment's prohibition against cruel and unusual are implicated."  *Hamilton v. Lyons,* No. 1:22-cv-257, 74 F.3d 99, 104 n.4 (5th Cir. 1996); *Cf. Flores v. Mesenbourg,* No. 95-17241, 1997 WL 303277, *1 (9th Cir. June 2, 1997) (unpublished opinion) (rejecting argument that a parolee awaiting a revocation hearing was a pretrial detainee—"He was subject to incarceration for parole violation because he had originally been convicted and given the sentence which was moderated by parole").   "Consequently, detained parolees can bring separate conditions of confinement claims under the Eighth and Fourteenth Amendments."  *Chavez v. Jefferson Cty., Texas,* 2024 WL 4148683, *2 (E.D. Tex. Sept. 11, 2024) (citations omitted).

The Due Process Clause of the Fourteenth Amendment prohibits conditions of confinement that amount to punishment.  *Bell,* 441 U.S. at 535.   Specifically, in *Bell* the Supreme Court stated that the government may detain defendants prior to trial and "may subject [them] to the restrictions and conditions of [a] detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."  *Id.* at 536-37.

> The Court articulated two ways to determine whether conditions rise to the level of punishment.   A plaintiff could show that the conditions were intentionally punitive.   Alternatively, if there is no expressly demonstrated intent to punish, the

---

[7] The County Defendants analyze Kykendall's conditions of confinement claim solely under the Eighth Amendment.

> plaintiff could also show the conditions were not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose.   If conditions are found to be arbitrary or excessive, it is permissible to infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Stearns v. Inmate Servs. Corp.,* 957 F.3d 902, 907 (8th Cir. 2020) (internal citations and quotation marks omitted).

In reviewing a conditions of confinement claim, the length of time the detainee is subject to the harsh conditions is considered and the court reviews the totality of the circumstances of the detainees' confinement.   *Stearns,* 957 F.3d at 909.   "Viewing the totality of the circumstances, we do not focus narrowly and require deprivation of any single need [as the Eighth Amendment analysis does].   Although, '[t]here is . . . a de minimis level of imposition with which the Constitution is not concerned.'"   *Id.* (quoting *Bell,* 441 U.S. at 539 n.21).

Here, Kykendall asserts that each County Defendant was aware of his falls and the problems he and other inmates had getting on the top bunk of the bunks that did not have a crossbeam or ladder.   (ECF No. 47-1 at 71, 86-96); (ECF No. 49 at 4).   Kykendall does not argue that the conditions under which he was confined were intentionally punitive.   Rather, he maintains that the failure to have the crossbeam or some means of safely getting on and off the top bunk was a safety hazard which resulted in his injury.   He was not assigned this bunk and there was a bunk available with a crossbeam to make access to the top bunk easier.   However, for what sounds like valid reasons—the inmate previously using it had contracted staph infection and no cleaning supplies were made available—Kykendall did not want to use the other bunk.   The alleged unsanitary conditions in the cell are not at issue in this case.   Rather, Kykendall's claim is limited to the safety of his bunk.

24

Kykendall's use of the bunk in question was for a limited period. After his second fall which occurred within a day or two of the first, Kykendall testified they made the inmate who slept below him change places. (ECF No. 47-1 at 58). Approximately two months later, Kykendall was moved and ended up on a top bunk that did not have a ladder. *Id.* at 59. He complained and an officer came and spoke to him. *Id.* When Kykendall said he was not supposed to sleep on a top bunk, the officer advised him he was just going to have to sleep on it. *Id.* However, Kykendall was moved the following day and he remained on a bottom bunk for the rest of his time at the UCDC. *Id.* at 60.

Based on the facts, there are no genuine issues of fact as to whether the use of a bunk without a crossbeam or ladder of some type constitutes punishment. The condition was not hazardous in the way a defective or broken product might be. Indeed, it was simply difficult for a person of short stature to easily get onto or off the top bunk. As bunks were not assigned, no one was specifically required to use these bunks. The County Defendants' actions were not intended to punish Kykendall and the Court cannot say that the use of the bunks was not related to a legitimate governmental purpose—providing off the floor sleeping arrangements for detainees— or were excessive in relation to that purpose. At most, the County Defendants were negligent in not providing a means to access the top bunk with more ease. *See Stearns,* 957 F.3d at 907 (mere negligence insufficient to violate the Due Process Clause). The County Defendants are entitled to summary judgment on the Fourteenth Amendment Due Process claim.

Having failed to establish a genuine issue of fact exists under the heightened standard of the Fourteenth Amendment, Kykendall cannot prevail on an Eighth Amendment claim which is analyzed under a deliberate indifference standard. *Thomas-El v. Francis,* 99 F.4th 1115, 1117

(8th Cir. 2024). This standard requires Kykendall to allege facts demonstrating that: (1) objectively, the deprivation resulted in the denial of "the minimal civilized measure of life's necessities," and (2) subjectively, the defendant "knows of and disregards an excessive risk to inmate health and safety." *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 837 (1994); *see also Rhodes v. Chapman,* 452 U.S. 337, 347, 349 (1981) (holding that the "Constitution does not mandate comfortable prisons" or that prisons be "free from discomfort")).

Qualified immunity protects government officials from liability for monetary damages unless, at the time of the alleged violation, their conduct violated a clearly established statutory or constitutional right. *Ashcroft v. Al-Kidd,* 563 U.S. 731, 741 (2011). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). While there need not be "a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

The County Defendants argue no case has ever held that bunk beds constitute an unconstitutional condition of confinement. (ECF No. 46 at 2). While the Court can conceive of circumstances in which the conditions of bunk beds could violate the constitution, the Court need not proceed further with the qualified immunity analysis because having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### 3.    Denial of Medical Care Claim

The deliberate indifference standard was set forth above in connection with Defendant Hopson's Summary Judgment Motion and will not be repeated here.   With respect to Defendant Roberts, Kykendall indicates that one time he reimbursed "me some money because I told him it was not my fault the reason I was at the doctor in the first place."   (ECF No. 47-1 at 71). Defendant Roberts was aware of his claim that he was injured when he fell because the bunk bed did not contain a crossbeam or ladder.   *Id.* at 86.   Kykendall also feels Defendant Roberts is responsible for medical care in the facility and was aware of Kykendall's problems.   *Id.*   With respect to Defendant Worley, Kykendall testified she was aware of his fall and took no steps to repair the bunk.   *Id.* at 86-88.    With respect to Defendant Sorrells, Kykendall testified he named him as a Defendant because of his knowledge about the problem with the bunks.   *Id.* at 90-91. Based on his testimony, Kykendall is not asserting a denial of medical care claim against Defendants Worley or Sorrells.   Thus, the Court's inquiry is limited to whether a there is a genuine issue of material fact as to whether Defendant Roberts exhibited deliberate indifference to Kykendall's serious health needs.

The hiring of a medical care contractor is insufficient to relieve Defendant Roberts of his constitutional obligation to provide detainees with adequate medical care.   *Langford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010).   For this reason, even though Defendant Roberts is not a medical care provider and does not treat inmates, he is not insulated from liability.   *Id.*   ("There is no doubt that [defendant] has a constitutional duty to see that prisoners in his charge who need medical care receive it"); *see also Schaub v. VonWald,* 683 F.3d 905, 918 (8th Cir. 2011).

27

"Section 1983 liability is personal." *Dahl v. Weber,* 530 F.3d 730, 733 (8th Cir. 2009) (citation omitted).  "To establish liability against supervisory officials like [Defendant Roberts, Kykendall] 'must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights.'" *Jones v. City of St. Louis,* 104 F.4th 1043, 1049 (8th Cir. 2024) (quoting *Clemmons v. Armontrout,* 477 F.3d 962, 967 (8th Cir. 2007)).

Although Kykendall testified Defendant Hobson was limited in type or amount of medical care she could provide because he was in jail and/or was limited by available funds, no evidence was presented suggesting these limitations, if they existed, were placed on Defendant Hopson by Defendant Roberts.  Other than Defendant Roberts' involvement in Kykendall being reimbursed for certain medical charges, nothing has been presented suggesting Defendant Roberts was involved in any way with the decision of the type, or timing, of the medical care provided to Kykendall.  Defendant Roberts' general responsibility for supervising the operations of the UCDC is "insufficient to establish personal involvement." *Ouzts v. Cummins,* 825 F.2d 1276, 1277 (8th Cir. 1987).  Defendant Roberts is entitled to summary judgment on the individual capacity claim against him.

### 4.  Official Capacity Claim

As no unconstitutional act has been found on the part of a Washington County employee, the County cannot be held liable.  *Webb v. City of Maplewood,* 889 F.3d 483 (8th Cir. 2018).

### IV.    CONCLUSION

For the reasons stated, the Motions for Summary Judgment filed by Defendant Hopson

and the County Defendants will be **GRANTED.** A separate judgment in accordance with this opinion will be entered.

DATED this 8th day of November 2024.

*/s/ Barry A. Bryant*

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE